OPINION
Rebecca Jenkins appeals from a judgment of the Clark County Court of Common Pleas, Juvenile Division, which granted permanent custody of her three minor children to the Clark County Department of Human Services ("the CCDHS").
Jenkins is the mother of Roy Michael Williams, born February 22, 1993, Joee D. Jenkins, Jr., born January 28, 1996, and Levi Dustin Jenkins born January 22, 1997. Joee Jenkins, Sr., her husband, was the father of Joee Jr. In February 1994, the CCDHS became involved with Jenkins following an incident during which she had become angry at Bessie Crable, her now deceased grandmother, and had tipped over Roy Michael's walker. Roy Michael was removed from Jenkins's home and lived with relatives until December 1994. Jenkins attended parenting classes and counseling sessions during that time. In April 1995, Roy Michael was again removed from Jenkins's custody after she attempted to take a drug overdose. He lived with Crable until September 1995, during which time Jenkins again took parenting classes and attended counseling sessions as required by her case plan. Roy Michael was returned to Jenkins, and she had custody of him and Joee Jr. until early June 1996 when they were removed from Jenkins's home due to her "non-compliance with services being provided which put the children at potential risk of harm." Roy Michael initially was placed with an aunt of Jenkins and then placed in foster care, and Joee Jr. was placed first with Joee Sr. and then placed in foster care.
On June 10, 1996, the CCDHS filed a "Complaint for Temporary Shelter Care" of Roy Michael and Joee Jr., alleging that they were dependent children. Following a hearing on July 8, 1996, the trial court ordered that the children be committed to the temporary custody of the CCDHS until June 10, 1997. The trial court appointed a guardian ad litem to represent the children's interests. On January 16, 1997, Virginia Bondurant, the paternal grandmother of Joee Jr. filed a motion for an order designating her as the residential parent of Joee Jr. On January 27, 1997, the CCDHS filed a motion to modify temporary custody of Joee Jr. and Roy Michael to permanent custody and a complaint for permanent custody of Levi. That same day, the trial court granted temporary shelter care of Levi to the CCDHS. The trial commenced on October 6, 1997. Following the testimony of one witness, the trial was continued pending an inquiry into a possible placement of the children in the legal custody of Bondurant. On October 15, 1997, Bondurant filed a notice of withdrawal of her motion for designation as Joee Jr.'s residential parent, and the trial court dismissed her from the case. The trial resumed on November 20, 1997, and Joee Sr. did not appear on that day or at any time thereafter. On January 6, 1998, the parties presented closing arguments, and the trial court subsequently granted permanent custody of the three children to the CCDHS and terminated all rights and duties of the parents. Jenkins appeals, raising three assignments of error, which we will treat in a single discussion due to the similarity of the issues.
 I. THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT FAILED TO CONSIDER ALL ALTERNATIVES PROSCRIBED BY O.R.C. 2151.353 BEFORE GRANTING PERMANENT CUSTODY OF THE CHILDREN TO CLARK COUNTY DEPARTMENT OF HUMAN SERVICES.
 II. THE TRIAL COURT ERRED IN GRANTING THE MOTION FOR PERMANENT CUSTODY OF THE JENKINS/WILLIAMS CHILDREN TO CLARK COUNTY DEPARTMENT OF HUMAN SERVICES AS ITS FINDING THAT THE PARENTS HAVE SUBSTANTIALLY FAILED TO COMPLETE AND FULFILL THE REQUIREMENTS OF THE CHILD'S CASE PLAN WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 III. THE TRIAL COURT ERRED IN GRANTING THE MOTION FOR PERMANENT CUSTODY OF THE JENKINS/WILLIAMS CHILDREN TO CLARK COUNTY DEPARTMENT OF HUMAN SERVICES AS ITS FINDING THAT THE CHILDREN COULD NOT BE PLACED WITH THEIR MOTHER WITHIN A REASONABLE PERIOD OF TIME WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Jenkins contends that, instead of granting permanent custody of her three children to the CCDHS, the trial court should have opted for the less drastic alternative of placing the children in her legal custody under an order of protective supervision. She further asserts that the trial court's findings pursuant to R.C.2151.414(E) were against the manifest weight of the evidence.
A child who has been adjudicated dependent may be committed to the permanent custody of a public children services agency or a private child placing agency if the trial court determines, in accordance with R.C. 2151.414(E), that the child cannot be placed with one of his parents within a reasonable time or should not be placed with either parent and that the "permanent commitment is in the best interest of the child." R.C. 2151.353(A)(4); R.C.2151.414(B). That permanent custody is in the best interest of the child must be found by clear and convincing evidence. R.C.2151.414(B). In determining the children's best interest, the trial court must consider all relevant factors, including the interaction of the child with his parents, foster parents and others; the child's wishes, as expressed by him or through his guardian ad litem; the custodial history of the child; and his need for a legally secure permanent placement. R.C. 2151.414(D). Pursuant to R.C. 2151.414(E), if the trial court determines by clear and convincing evidence that one or more of the listed circumstances exist as to each of the child's parents, the trial court is required to enter a finding "that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent."
In this case, the trial court found that the circumstances described in R.C. 2151.414(E)(1), (2), (3), (4), and (9) existed. The trial court discussed both parents and all three children in a single judgment entry, which may explain the inartfulness of some of the trial court's language in making its findings pursuant to R.C. 2151.414(E):
 The parents have failed continuously and repeatedly for a period in excess of six months to substantially remedy the conditions that caused the child to be placed outside his/her home. The movant has offered through its case plan with the parent counseling, education, substance abuse, transportation and foster care services that could assist the parent to meaningfully change their conduct and home life. The parent have failed to utilize and internalize the proffered services. The parent have mechanically completed some classes, interventions and trainings but haven't materially changed their behavior, habits or parenting. The mother continues to have relationships that are unsafe for herself and the children. Neither parent has safe, law abiding friends or relatives. No external support exists to allow either parent to safely raise the child.
 The parent use of and dependence on chemicals is severe and not consistently halted. The chronic use of chemicals makes the parent unreliable, and their home unsafe. The parent used drugs and/or alcohol to excess before the child was removed. The parent have continued misusing illegal drugs and/or alcohol even after removal of the child. The mother is borderline mentally retarded and suffers from epileptic seizures. The father is unable to control his emotions. The parent home is not an adequate permanent home for this child now, nor is it likely to be such within the next year.
 The parent have neglected the health, morals and well being of the child by allowing the child to live in an unsafe home before removal, by maintaining an immoral life style that is open and obvious to the children and by failing to immunize the child in a timely manner. The sexual practices of the parent are illegal and dangerous. The parents home is not safe from domestic violence. The mother has repeatedly returned to the abusive father after numerous separations. By mothers own admission she couldn't protect her child from sexual abuse.
 The parent have demonstrated a lack of commitment toward the child by their inconsistent visitation, their failure to provide financial support and their lack of meaningful, necessary communication with the child. The parents are physically and financially able to accomplish these duties or could work, travel and communicate if they choose to meet the needs of their child. For over a year they did not earn a penny that they used to support the child. With a little more effort and concern from the parent the child could do much better. The parent are not committed to working hard for the child and making the necessary sacrifices to provide an adequate permanent home for the child. The parent actions or inactions speak louder than their 12th hour words. The child needs regular, consistent stimulation, attention and love from his/her parents and don't receive it.
 The parent is unwilling to provide for the basic needs of the child. The parent has not obtained or maintained a safe home, with proper furnishings, sufficient food and minimal cleanliness. The parent has allowed the child to be physically, and emotionally neglected by his/her laziness, inattention or callous habits and practices. The mother is unable and the father unwilling.
The trial court further concluded that the children "should not and cannot be placed with either of [the] parents within a reasonable period of time" because the parents had "established and maintained a sporadic and disjointed parent/child relationship," the children were well-adjusted to living in foster care and would not be harmed by the granting of permanent custody, Jenkins and Joee Sr.'s "abilities to parent have not materially changed" despite the CCDHS's "repeated and numerous interventions," there is no assurance as to when Jenkins may be able to adequately parent the children, and "the evidence is overwhelming that [Jenkins] would be able to parent the child if, and only if she had the significant and constant support of another adult."
Additionally, the trial court found that the CCDHS had made "determined and reasonable" efforts to prevent removal of the children by paying for psychological assessments; by providing twenty-four hour homemaking assistance, foster care, scheduled visitations with the children, counseling services, and referrals and guidance on issues of transportation, sexual predators, drug and alcohol counseling, battered women's shelter, MR/DD services, utility services, housing, parenting classes, and employment training; by seeking potential relatives to care for the children; and by assisting the parents in working on their case plan objectives.
Finally, the trial court found that permanent commitment would be in the children's best interest because there was a reasonable probability that they could be adopted, the children would be capable of proper growth and development if placed in an appropriate home, the children had not lived exclusively with their parents for quite some time, there was no probability that the parents would be able to provide an appropriate home environment any time soon, the guardian ad litem had recommended permanent custody, Joee Sr. did not love or want to raise his child, and Jenkins could only meet the children's basic needs with constant adult supervision.
On appeal, we must determine whether the trial court complied with the R.C. 2151.353 and 2151.414 and whether its findings pursuant to R.C. 2151.414(E) were supported by clear and convincing evidence. In re Dylan C. (1997), 121 Ohio App.3d 115,121. Clear and convincing evidence requires proof that "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." In reAdoption of Holcomb (1985), 18 Ohio St.3d 361, 368, quoting Crossv. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus. Furthermore, the trial court's discretion in determining whether permanent commitment is in the best interest of the children "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." In re Awkal
(1994), 95 Ohio App.3d 309, 316.
The state presented the following evidence at trial.
Terrie Murphy, f.k.a. Terrie Davidson, a former CCDHS social worker who began working on the Jenkins case in August 1995, testified that on April 25, 1996, she had warned Jenkins not to allow Scott Paul, Tim Eldridge, and Lonnie Winkle near her children or into her home because they were known at the CCDHS to be child sex offenders. Murphy stated that Mary Dillman, the parent aid who provided homemaking assistance to Jenkins, had reported that Paul and Winkle were inside the home on May 14, 1996. Murphy further testified that even with twenty-four hour assistance since May 21, 1996, Jenkins had not been able to adequately care for her children, as shown by their removal in June 1996. Murphy further stated that only with positive adult assistance would Jenkins be able to provide a safe, stable, and nurturing environment.
In Jenkins and Joee Sr.'s June 17, 1996 case plan, Murphy listed the following objectives, which were to be completed by July 1997: (1) obtain psychological and parenting assessments from Dr. Steven Zartman and follow all of his recommendations; (2) receive case management and counseling services from a CCDHS social worker; (3) attend parenting classes to learn "how to protect the children from each other and others and to learn disciplinary skills for the children;" (4) schedule and attend all necessary medical appointments for the children; (5) attend supervised visitations with the children on a regular basis; and (6) obtain and maintain suitable housing. In the December 10, 1996 progress review, Murphy noted that "Rebecca and Joee have completed most of the case plan," including attendance at parenting classes and visitations and maintenance of suitable housing.
Julie Nourse, Jenkins's caseworker during Murphy's leave of absence and upon Murphy's departure from the CCDHS, testified that she had observed that Jenkins was unable to control or discipline her children during visitation sessions. She also stated that, in the past, Jenkins and Joee Sr. had separated and then reunited on several occasions. Nourse stated that, in her opinion, Jenkins could not properly care for or protect her children because "it's been so very unstable with her relationships." On the February 24, 1997 amendment to the case plan, Nourse noted that the children would suffer serious physical or emotional harm if they remained in the home because, even with the case management, case counseling, homemaker, protective day care, and parent education services provided by the CCDHS, Jenkins had exposed her children to physical, emotional, and sexual abuse by allowing child sex offenders into her home.
Wendy Dixon, a CCDHS supervisor who specialized in child sex abuse cases, testified that on two separate occasions she had warned Jenkins not to allow Winkle or Paul to have any contact with her children or to come into her home because she was concerned that her children "could become victims of sex abuse if these people were involved with the children." Dixon further testified that, even if assured that Paul, Winkle, and Eldridge would never come around Jenkins or her children, she would be concerned that Jenkins "would still potentially find someone else that would exhibit those same types of behaviors; and historically we have told her on a number of occasions not to, and she's made those promises and not followed through."
Dillman testified that she had assisted Jenkins with homemaking tasks from March to May 1996 and that although Jenkins had tried to effectively care for her children and had kept them children clean, healthy, and properly clothed, she could not provide a stable environment because of her volatile relationship with Joee Sr. and her inability to cope with stress. Dillman stated that "absolutely she loves her children; but sometimes it was just very, very hard for her to handle and very hard for her to deal with." Dillman also testified that, after having been warned not to associate with the child sex offenders, Jenkins had allowed Paul to come back into her home, to stay there overnight, and to bathe Roy Michael. Dillman testified that she had requested a transfer in May 1996 because the stress level in the Jenkins home had become overwhelming.
Karen Henschen, Dillman's supervisor, testified that Paul, Winkle, and Eldridge "have been in multiple clients' homes where there has been suspicion of child sexual abuse," that Paul had been in Jenkins's home at least six times after Murphy had warned Jenkins about the men and that Paul had assisted Jenkins in caring for the children, including "bathing, dressing, toileting, and parenting" them.
Rhonda Ramey, the visitation coordinator at the Clark County Children's Home, testified that Jenkins had attended sixty-seven of the seventy scheduled two-hour visitations, which she described as generally chaotic. Ramey stated that, throughout the year, Jenkins had not shown much improvement in interacting with her children and that she would not be able to provide a stable home environment for the children because of her poor skills as a disciplinarian.
Neurologist Dennis P. Sullivan testified that he had treated Jenkins for "complex partial epilepsy" since 1989 and that she had not experienced a seizure since 1994 due to the stabilizing effect of medication. In his May 22, 1996 letter to CCDHS, he explained that Jenkins has "borderline intellectual function" and "very poor judgment," which had at times made compliance with her medical therapy "less than desirable." He testified that Jenkins would require intensive "day-in and day-out assistance" to be able to care for her children.
Psychologist Orphus Taylor testified that she had conducted a psychological evaluation of Jenkins in August 1997 and had started counseling her in October 1997. She stated in her written evaluation that Jenkins "is vulnerable and may be exploited; she needs supervision because she lacks good judgment" and that "she is too trusting where her children are concerned." Taylor testified that, in her professional opinion, Jenkins "would have difficulty in providing a long-lasting * * * safe environment for her children unless there were someone there to guide her every step of the way."
Crystal Olmstead, a licensed social worker at Family Service Agency who had counseled Jenkins since January 1997, testified that she had tried to help Jenkins improve her decision making skills and that although Jenkins had seemed to understand during the counseling sessions that she should stay away from Joee Sr. and the child sex offenders, "[t]he information and the [progress] in counseling that seemed clear would apparently disintegrate after she left because — it was like starting over each week." Olmstead informed the CCDHS in a letter dated September 10, 1997 that Jenkins had been relatively consistent in attending weekly appointments, that her "progress has been limited," that she "continues to display poor judgment and poor decision making skills," and that she is vulnerable to reuniting with Joee Sr., who repeatedly had been physically and verbally abusive to her. Olmstead expressed her opinion that Jenkins "is not capable of providing a safe and nurturing environment for her children" and that "it's definitely not in the best interest of the children to be with their mother."
Psychologist James v. Smith, Olmstead's predecessor at the Family Service Agency, stated in an October 21, 1996 letter to CCDHS that Jenkins does not possess "the internal strength, the decision making skills, the emotional steadiness, nor the consistent desire to improve the environment she would provide for the children."
Dr. Zartman testified that he had interviewed Jenkins, had performed psychological tests on her, and had observed her interacting with Joee Sr., Roy Michael, and Joee Jr. In his written evaluation, Dr. Zartman concluded that "under ideal circumstances, when supervised, and for at least short periods of time, Mr. and Mrs. Jenkins are capable of parenting Michael and Joee well"; however, there was a high probability that Jenkins would not be able to provide a safe, stable, nurturing home for her children on a long-term basis under "real life" circumstances. Dr. Zartman stated that "it is probable that the same kinds of problems which resulted in the removal of Michael and Joee from Mr. and Mrs. Jenkins's custody will recur if the children are returned to their care."
Bondurant testified that she had observed Jenkins's bad temper and that Jenkins and Joee Sr. had separated and reunited several times in the past. She also testified that, although she had withdrawn her previous motion to be named the children's residential parent, she still would be willing to accept custody of them.
Jenkins's defense consisted of showing that she had completed the requirements of her case plan, that she loved her children and was committed to providing a safe, stable, and nurturing environment for them, and that she had made progress in staying away from Joee Sr. and the child sex offenders and in disciplining her children. She testified when called as a state's witness and during the presentation of her case. She elicited from Murphy and Taylor that her January 1, 1997 letter to CCDHS caseworkers describing how she had refused Winkle's attempt to enter her home and had told him to stay away from her and her children was a sign of progress. She introduced evidence of her outstanding attendance at parenting classes and at scheduled visitations with her children.
Dr. Phillip Gibeau, a clinical psychologist who evaluated Jenkins's fitness as a parent on December 17, 1997, recommended that:
 (1) Mrs. Jenkins be given the opportunity to show her ability as a parent in the natural home environment; (2) a series of visits with the children be arranged that vary in time and day of the week; (3) on-site supervision be provided for (a) evaluation of her efforts and (b) support/direction for her interaction; (4) the children be evaluated regarding their emotional stability/needs for therapeutic intervention; (5) a restraining order be in place to eliminate bad influences (spouse-sexual perpetrators) on herself or the children; (6) Mrs. Jenkins continue her medication for her history of seizures; (7) Mrs. Jenkins receive respite care in managing her children; and (8) routine evaluation be made regarding her progress in meeting basic standards of parenting.
Dr. Gibeau testified that "she has a great capacity for becoming a better parent than what seems to be the case up to this point, but I don't know how far she can go" and that he did not know whether Jenkins was in a position to adequately care for her children because "she really hasn't had the chance to implement some of the parenting skills that she has supposedly learned by being in class." When asked whether Jenkins would be able to respond to emergency situations posing a threat to her children's safety, Dr. Gibeau stated that, while "her basic instinct to care for and protect the children is in place," her ability to make decisions on her own in unfamiliar circumstances was limited by her "developmental handicap, her experience." Dr. Gibeau recommended a "graded reintegration" of the children into Jenkins's home.
On cross examination, the state demonstrated that Dr. Gibeau had been unaware that Jenkins had completed two series of parenting classes and had received twenty-four hour homemaking assistance prior to the latest removal of the children. The following dialog occurred:
 Q. * * * If we've tried parenting classes with the child, parenting classes without the child, in-home mentoring with a parent aide, supervised ongoing visitation, years of counseling, social work interaction from the social worker trying to guide her, family members trying to help her, and none of this has worked in the past, what should we be doing differently?
 A. Well, I don't know that none of it has worked. You know, my feeling is that she has picked up on some, you know, of these things because she does talk about, you know, what she should do here and what she should do there.
 She obviously has profitted [sic] from the parenting classes. The application may leave a little bit to be desired, you know, this way; but that's another phase of the learning process because she learns as slowly as she does, we've got to find more appropriate reinforcers.
 Right now to all of a sudden bring three children in at their young ages, that's a bit overwhelming. If we bring them in in a graded sequence and assist her, I think there's that good possibility that she might be able to handle that better.
 The ultimate results are dependent on how well she learns and the personality features of the children as they grow.
 Q. * * * [A]s a professional, if we worked with Rebecca for the last four years since she's had children and she has not gotten to the point in the last four years of where today she's capable of handling the needs of her children and providing a safe and stable environment for them, do you have a professional opinion as to how many more chances or how much longer we should attempt to work with her?
* * *
 A. The safest prognosis is one that we call guarded, uncertain, you know, at this stage of the game. But between the previous testing and the current testing, the letter writing, the personal contact, her potential is better than what she's done to this point.
* * *
Q. Can you give us any timeframe?
A. No. I'm sorry.
 Q. So you cannot say that in six months or a year from now that there would be a significant enough change that the environment would be safe for these children?
 A. I think I could say that in six months, we would know whether or not she has the capacities to do those things that we've asked for. * * * I would like to build on what has been done previously to find out if we can enhance her potential to get her to function at a higher level.
Jenkins's aunt Pamela Eanes testified that she would help Jenkins care for her children but could not provide constant assistance or invite Jenkins to live in her home. Jenkins's mother, Angela Huennerkopf, testified that Jenkins had recently become better able to control her temper and to parent her children and that she would be willing to assist Jenkins and to accept custody of the children. She testified that she had just recently become able to accept custody of Jenkins's children because her two youngest children "are more or less looking toward getting on their own." She stated that, because she lived in subsidized housing, she would have to obtain approval before moving into an apartment large enough to house Jenkins's children and could not even apply for one until she actually had the children with her. She testified that her sole income source was disability benefits for her "nervous stomach," which prevented her from working outside the home but would not prevent her from caring for Jenkins's children. Belinda Williams, Jenkins's twenty-four-year-old sister, testified that she would help Jenkins care for her children and that she had not come forward earlier because she had been dealing with her decision to place a baby up for adoption.
In closing argument, the guardian ad litem stated:
 I have recommended in my report of the Guardian Ad Litem, which I filed in May of `97, and my supplemental report, that I thought that neither Joee or Rebecca was capable of parenting these children on their own.
 I did have some concerns — or I did have some hope that by working together they could resolve some of these issues and provide a home for their children. Since they are split up, I don't feel that either one of them singly is capable of doing that.
 On occasions I have requested that someone be found suitable to assist them. To raise these children properly they would need 24-hour assistance. No one has been made known to me that is willing to do that.
 The question about the sexual predators is a question of safety. A sexual predator is obviously a safety issue, but there are other safety issues that have to be considered as well.
 I don't feel that there is any evidence that I heard that convinces me that Rebecca is in a position to make determinations about their safety. I don't believe she is able to process the kind of decisions she needs to make to protect the children in an emergency situation.
 Everybody can raise children if things are fine. When things go wrong, you need to know what to do. I don't believe she has.
 Joee, by his absence, I have no way to determine whether he is able to do that.
 His failure to appear indicates a lack of interest in wanting to parent these kids.
* * *
 I feel it is in the best interest of the children to award permanent custody to the Department of Human Services and provide them with a safe, stable, and nurturing environment.
 I certainly don't deny that Rebecca cares for her children. I think she loves them a lot. Love is not enough. You need more.
 I would support Mr. Martin's statements about the possibility of open adoption so Rebecca would have the ability to have contact with her children.
 I believe they need to be placed some place they are safe. I don't believe that is with Rebecca or Joee.
Without deciding whether the trial court's findings on the existence of the circumstances listed in R.C. 2151.414(E)(2), (3), (4), and (9) were adequately supported by the evidence, its finding pursuant to R.C. 2151.414(E)(1) that Jenkins had failed continuously and repeatedly to remedy the situation that caused the initial removal of the children from her home was supported by clear and convincing evidence. Although witnesses testified that with assistance, Jenkins could handle taking care of her children's basic needs, the testimony of several witnesses was that Jenkins's poor decision making skills would prevent her from protecting her children from individuals, particularly child sex offenders, and situations threatening their safety. Jenkins claims that she made progress in avoiding individuals who threatened her children's safety; however, in our judgment her letter to CCDHS caseworkers does not override the greater weight of the evidence that Jenkins had made little progress toward improving her decision making skills and that she was likely to continue maintaining the unsafe home environment that led to the spring 1996 removal of her children. Despite Jenkins's claim that she permanently removed herself from the unstable and abusive relationship with Joee Sr., the testimony of several witnesses that she and Joee Sr. had repeatedly separated and reunited supported the trial court's finding that Jenkins continues to be involved in unsafe relationships and that there was no assurance that she could provide a safe home environment at any time soon. Jenkins claims that members of her family would assist her in raising the children; however, it was reasonable for the trial court to find that none of the individuals upon whom she would rely for support had demonstrated that they would or could provide the constant supervision and guidance that witnesses testified would be necessary for Jenkins to adequately care for her children. In our judgment, the record contains competent, credible supporting the trial court's finding that the children could not be placed with Jenkins within a reasonable time or should not be placed with her. Furthermore, the trial court acted well within its discretion in concluding that permanent commitment was in the children's best interest based on its findings that Jenkins had maintained a "sporadic and disjointed parent/child relationship," that the children could probably be adopted and raised in a nurturing home environment, that Jenkins could adequately care for the children only with constant adult supervision, and that the guardian ad litem had recommended permanent custody. Thus, the trial court acted appropriately in awarding permanent custody to the CCDHS.
The assignments of error are overruled.
The judgment of the trial court will be affirmed.
BROGAN, J. and FAIN, J., concur.